2016 IL App (4th) 160245
NOS. 4-16-0245, 4-16-0284 cons.

FILED
December 28, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: The Matter Of, | ) | Appeal from |
| THE CRIMINAL CONTEMPT OF: | ) | Circuit Court of |
| | ) | Scott County |
| SUSAN TURNER (No. 4-16-0245), | ) | No. 14CC1 |
|     Contemnor-Appellant. | ) | |
| _____ | ) | |
| In re: The Matter Of, | ) | No. 14CC2 |
| THE CRIMINAL CONTEMPT OF: | ) | |
| | ) | Honorable |
| KAREN L. HUDSON (No. 4-16-0284), | ) | David R. Cherry, |
|     Contemnor-Appellant. | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Pope concurred in the judgment and opinion.

**OPINION**

¶ 1       In April 2014, contemnors, Susan Turner and Karen L. Hudson, attended a jury

trial involving concentrated animal feeding operations, an operation they opposed. During a

lunch recess, an attorney for one of the parties informed the trial court that he learned

contemnors were distributing material espousing the detriments of concentrated animal feeding

operations to members of the gallery. The court did not personally witness these acts. Following

the court's investigation of members of the gallery and the jury, the court held contemnors in

direct criminal contempt of court for distributing prejudicial material within the courtroom.

¶ 2    Contemnors appeal, arguing that the trial court erred by finding them in direct criminal contempt. Following oral arguments, we reversed the court's order from the bench with this written order to follow.

¶ 3                                I. BACKGROUND

¶ 4                                A. Factual Overview

¶ 5    In April 2014, a jury trial commenced in a civil proceeding involving concentrated animal feeding operations (Scott County case No. 10-L-3). After the parties had impaneled a jury, but prior to the presentation of evidence, the parties met in the trial judge's chambers. The defendant's counsel informed the trial court that a "lady known to [the] [p]laintiffs' counsel" carried a box of books denigrating industrial animal factories into the courtroom. During the proceedings, the material in question is interchangeably referred to as books, booklets, pamphlets, and literature; for consistency's sake, we will refer to the material as books. According to the defendant's counsel, he received a report during the lunch recess that the woman distributed these books, which were prejudicial to the defendant, to people in the gallery in the presence of the bailiff. The defendant's counsel was concerned that the books would make it into the possession of the jury. The court recalled seeing a woman with a box but did not observe her distributing any material. The court then told the parties they would all investigate the matter in the courtroom and later question the jury to see if they knew about the book. In the meantime, the jury was sequestered in the deliberation room.

¶ 6    Upon returning to the courtroom, the trial court ordered everyone in the gallery to remain in the courtroom due to a breach in security. The court then asked those sitting in the gallery if they had any information about a person with a box of books who was passing out

- 2 -

those books to members of the audience. Eleven people raised their hands to indicate they had observed the person.

¶ 7　　　　Upon questioning, two people in the gallery recounted receiving a copy of a book from a woman. Eventually, the contemnors were identified, and the trial court called for them to approach the bench. The court asked Hudson whether she brought the books in the courtroom. She admitted she brought them and distributed the material while court was not in session. The court held Hudson in direct criminal contempt, stating, "You are here to influence a jury. That is jury tampering. That is a felony."

¶ 8　　　　The trial court then asked Turner if she had distributed any books. She replied she had not, but she had distributed her consulting card to a woman in the gallery. Upon further questioning by the court, Turner also admitted passing out what appears from the record to have been some type of pamphlet, not the books in question. The court then stated, "This is not the proper venue for you to get on a soap box," and found Turner in direct criminal contempt. The court ordered contemnors taken into custody and told them they would be charged with jury tampering and held until bond had been set. When Turner apologized, the court responded, "Apologies don't make it. When you come in and ruin almost 3, 4 years of work that these attorneys have worked for, in an attempt to forward your personal agenda, you are using the wrong forum." The court again told Turner and Hudson they were in contempt and instructed that they be held in jail until the court could get back to them.

¶ 9　　　　After contemnors were taken into custody, the attorneys for both sides disavowed any knowledge that contemnors intended to distribute any material. The trial court again noted it saw one of the women carrying a sealed box but made no mention of seeing anyone distribute

any books. Likewise, the bailiff did not observe anyone passing out books or anything else. The court stated, "This taints everything we stand for. And this deserves, this deserves prison."

¶ 10          After calling the jury back into the courtroom for questioning, one juror disclosed that he observed a woman passing out a book in the gallery, but he did not see its title or have any contact with it after observing the woman hand it out. The trial court went on to ask if any jurors recognized anyone sitting in the gallery. Multiple jurors indicated they knew people sitting in the gallery. The court remarked to the jury, "You are a target now, you know. *** For you to be improperly influenced by some outside source is hard enough to put up with all these lawyers, but to be influenced or [for] somebody outside of this to try to influence you is criminal and, in fact, it is a crime in Illinois to try to tamper with the jury." The court later declared a mistrial.

¶ 11          The same day, while still in custody, Turner and Hudson again appeared before the trial court. An attorney, Judy Koehler, was present and indicated to the court that Attorney John Coonrod would be representing Turner and Hudson. Koehler indicated she knew Hudson from when Koehler lived in the Peoria area. By invitation of the court, Koehler sat next to contemnors. However, Koehler did not enter her appearance in the matter. The court never called on Koehler to present evidence, argue, or make a recommendation, and Koehler did not attempt to do so. Coonrod did not appear on that date.

¶ 12          The trial court told the women they had been held in direct criminal contempt for performing an act "in front of the [c]ourt" and "in derogation of admonishments given to the jurors, potential jurors, the jury pool[,] and the gallery not to talk about this case." The court again found the women in direct criminal contempt and fined them each $500, ordering them held in custody until the fine had been paid. It provided no opportunity for the women to present

evidence or provide statements in allocution. Other than verifying the parties' identities, the only question the court asked was whether Hudson was a "Ms." or "Mrs."

¶ 13        The following day, the trial court entered a written order of contempt. The court found no petition of allegations was required as the violation occurred in front of the judge. The court also determined the women "admitted passing out the objectionable [books] during the trial, apologized to the court for [their] actions, and indicated [they] did not know [they] could not do so." The court further noted, "There is no burden of proof required as the [c]ourt has witnessed the violation which occurred in the courtroom during a trial."

¶ 14        In June 2014, contemnors filed a motion to vacate the judgment of direct criminal contempt, asserting (1) contemnors' alleged misconduct did not occur in the physical presence of the trial court or any of the parties, which resulted in the court improperly conducting an investigation before reaching any conclusions; (2) the book in question was not recovered from the courtroom; (3) nothing in the record demonstrated contemnors caused any disruption or distraction from the proceedings; (4) no evidence suggested the jury had any knowledge of the contents of any books distributed; (5) the court improperly interrogated contemnors by the use of leading questions and not providing an opportunity to fully respond to any of its inquiries; and (6) the court improperly refused to entertain contemnors' apologies. Therefore, contemnors requested the court vacate its contempt order because (1) the conduct did not occur before the court as was necessary to sustain a finding of direct criminal contempt and (2) the court failed to provide them with the constitutional safeguards necessary for a finding of indirect criminal contempt.

¶ 15        In September 2014, the trial court held a hearing on contemnors' motion to vacate the contempt finding. Contemnors argued they were unaware they had broken any court rules

that would subject them to criminal-contempt proceedings, nor did the court witness their conduct as necessary to find them in direct criminal contempt. Moreover, contemnors asserted they were not provided any opportunity to allocute prior to the imposition of a sentence.

¶ 16    The trial court found contemnors were provided with the necessary hearing and that their conduct occurred in front of the court. The court stated contemnors were provided with an opportunity to make a statement prior to sanctions being imposed. The court took the matter under advisement pending depositions by contemnors.

¶ 17    In January 2015, contemnors filed a supplemental motion to vacate the order of direct criminal contempt following their depositions. The depositions demonstrated contemnors were associated with a group that opposes concentrated animal feeding operations, such as hog farms. In her deposition, Turner stated she attended the trial to observe the proceedings due to her interest in the subject matter, and she had no intention of disrupting or interfering with the trial. Turner stated she was unaware Hudson had brought any books into the courtroom, nor did she see Hudson distribute any books. Turner further explained she had material in her purse, which she distributed to three people prior to court proceedings. According to Turner, she was unaware her conduct was prohibited.

¶ 18    In her deposition, Hudson admitted to bringing a box of books into the courthouse. Hudson stated she placed the box in a corner so it was not visible. Prior to court convening, she distributed two books to people she recognized as supporting her cause. Hudson stated she was unaware she could not bring these books into the courtroom, and she did not intend to disrupt or interfere with any court proceedings.

¶ 19    A supplemental motion filed with the depositions asserted that the trial court erred by holding contemnors in direct criminal contempt because it did not witness the conduct

firsthand but learned of it through its own investigation. Further, contemnors argued that the court erred by finding them in criminal contempt because there was no evidence their conduct was calculated to impede, embarrass, or obstruct the court. Contemnors also alleged the court denied them their fundamental constitutional rights with respect to contempt petitions.

¶ 20 Fourteen months later, in March 2016, the trial court entered a written order denying contemnors' motion to vacate the judgment of direct criminal contempt.

¶ 21 This appeal followed. We docketed Turner's appeal as No. 4-16-0245 and Hudson's appeal as No. 4-16-0284. We have consolidated contemnors' cases for review.

¶ 22 II. ANALYSIS

¶ 23 On appeal, contemnors assert the trial court erred by holding them in direct criminal contempt.

¶ 24 When reviewing a finding of direct criminal contempt, we look to whether (1) "there is sufficient evidence to support the finding of contempt," and (2) "whether the judge considered facts outside of the judge's personal knowledge." *People v. Simac*, 161 Ill. 2d 297, 306, 641 N.E.2d 416, 420 (1994). A finding of direct criminal contempt is "strictly restricted to acts and facts seen and known by the court, and no matter resting upon opinions, conclusions, presumptions or inferences should be considered." (Internal quotation marks omitted.) *Id.* A person may be found in direct criminal contempt for his or her actions under two circumstances. The contemptuous acts must be (1) "personally observed by the judge," or (2) "committed outside the immediate physical presence of the judge but within an integral part of the court." *People v. Hixson*, 2012 IL App (4th) 100777, ¶ 12, 965 N.E.2d 447. We examine these two circumstances individually.

¶ 25                                    A. Personal Observation

¶ 26            In this case, none of contemnors' acts were personally observed by the trial court. Despite the court's written order stating that the contemptuous acts occurred in the presence of the court, the record rebuts this assertion. The court learned of contemnors' alleged misconduct during a lunch recess, when the defendant's attorney spoke with the court in chambers about information he received from another person about contemnors distributing books. Until that point, the court had no knowledge of any inappropriate behavior, other than seeing Hudson carrying a box into the courtroom earlier that morning. It was not until the court returned to the courtroom and interrogated those sitting in the gallery that it received evidence of the alleged contemptuous conduct. In *People v. Tomashevsky*, 48 Ill. 2d 559, 565-66, 273 N.E.2d 398, 402 (1971), the supreme court held a contemnor may not be held in direct criminal contempt for laughing in open court in the actual presence of the court where the court had no personal knowledge of the laughter. Here, while the conduct may have occurred in the courtroom, the trial court did not personally observe the conduct. Thus, we are left to determine whether contemnors' acts occurred within an integral part of the court that would support a finding of direct criminal contempt. See *Hixson*, 2012 IL App (4th) 100777, ¶ 12, 965 N.E.2d 447.

¶ 27                                    B. Constructive Presence

¶ 28            Where a contemnor's acts occur within an integral part of the court, those acts are considered to have occurred in the "constructive presence of the court [and] may call for the hearing of extrinsic evidence." (Internal quotation marks omitted.) *People v. Javaras*, 51 Ill. 2d 296, 299, 281 N.E.2d 670, 672 (1972). The courtroom would certainly seem to constitute an integral part of the court. Even so, in the event of direct criminal contempt based on the conduct taking place within an integral part of the court, a contemnor is entitled to the same procedural

protections as a person charged with indirect criminal contempt. *Hixson*, 2012 IL App (4th) 100777, ¶ 14, 965 N.E.2d 447. In *Hixson*, this court set forth such procedural safeguards as including:

> "(1) notice of the nature of the contempt charges; (2) an opportunity to answer the alleged charges; (3) right to a hearing; (4) the privilege against self-incrimination; (5) the presumption of innocence; (6) the right to be proved guilty beyond a reasonable doubt; (7) right to counsel (and to appointed counsel if indigent); (8) right to confront and cross-examine witnesses; (9) right to be personally present at trial; (10) right to testify or to remain silent; (11) right to compulsory process for obtaining witnesses; and (12) right to present the testimony of witnesses favorable to his or her defense." *Id.* ¶ 19 (citing *In re Marriage of Betts*, 200 Ill. App. 3d 26, 58-59, 558 N.E.2d 404, 425-26 (1990))."

¶ 29     Thus, assuming, *arguendo*, contemnors' acts occurred in the constructive presence of the court, the trial court failed to provide contemnors with the necessary procedural safeguards. Contemnors stood before the trial court on two occasions. On the first occasion, which occurred immediately after the court found contemnors had improperly distributed material, the court interrogated them without explaining any of their procedural rights, which would include their (1) right to remain silent, (2) right to counsel, and (3) privilege against self-incrimination. Contemnors were not even provided with notice that the court was considering the imposition of direct criminal contempt prior to responding to the court's leading questions.

¶ 30     On the second occasion, later that afternoon, contemnors received what the trial court deemed a hearing. As noted, while an attorney was present, she did not act as counsel for contemnors. The proceedings constituted less of a "hearing" and more of a lecture by the court.

The court stated it had already found contemnors in direct criminal contempt and explained they would have an opportunity to speak at the sentencing phase. This opportunity never arose. Because the court determined that the conduct occurred in front of the court, it found no further procedural safeguards were required. In other words, contemnors were not provided an opportunity to fully respond to the contempt charges or informed of their right to a hearing. The court did not explain to contemnors their right to remain silent or to testify, their privilege against self-incrimination, their right to confront and cross-examine witnesses and be found guilty beyond a reasonable doubt, or the presumption of innocence. As a result, the court provided no opportunity for contemnors to be heard or to present any testimony, particularly regarding the willfulness of their behavior. In short, contemnors were not afforded their procedural rights as required.

¶ 31    Accordingly, we vacate the trial court's finding of direct criminal contempt.

¶ 32                              III. CONCLUSION

¶ 33    For the foregoing reasons, we vacate the judgment of the trial court.

¶ 34    Judgment vacated.