NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250098-U

NO. 4-25-0098

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Whiteside County |
| NAMIR I. BUCK, | ) | No. 25CC1 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Rangel-Kelly, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Steigmann and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed an order holding defendant in direct criminal contempt
where (1) the trial court personally observed the contemptuous conduct and (2) the
contempt order was conducive to appellate review.

¶ 2     Defendant, Namir I. Buck, appeals an order holding him in direct criminal contempt
and sentencing him to six months in jail. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4     Buck was the defendant in Whiteside County case No. 23-CF-226. His conduct in
connection with that case on November 20, 2024, led to him being held in direct criminal contempt
in the instant action, case No. 25-CC-1. The record on appeal does not include the common law
record or any reports of proceedings pertaining to case No. 23-CF-226. However, an affidavit in
the record prepared by a court reporter certifies that there were no proceedings reported in that
case on November 20, 2024.

¶ 5        On January 3, 2025, the trial court held contempt proceedings in case No. 25-CC-1. Although Buck was present with counsel that day for his underlying criminal case, the court stated that it had "business with" Buck that did not involve counsel's representation. The court then said:

> "Mr. Buck, when you were last before this Court back on November 20th your actions caused this Court to find you in direct criminal contempt.
>
> You were advised that you had an arrest warrant by law enforcement. You fled this courtroom[,] injuring persons in the courtroom, gave chase, and fled from law enforcement officers and ignored their commands, all in the presence of this Court and so I'm finding you in direct criminal contempt."

The court informed Buck that he could make a statement in allocution and that possible penalties included a fine of up to $500 and up to six months in jail.

¶ 6        Buck made a statement in allocution. He indicated that he was trying to right his wrongs and work on himself while incarcerated for the past 45 days. He understood that he "was wrong for jolting out of the courtroom" but said he did so out of fear, as a fight-or-flight reaction. He apologized "to the Court and to whoever I injured in that moment." He knew he "was 100 percent completely wrong" and expressed his desire for "a second chance at life."

¶ 7        The trial court sentenced Buck to six months in jail for direct criminal contempt. The court explained that this would be a lesson to Buck that when he is told he has an arrest warrant and is going to be placed under arrest, he is "not free to leave," and fleeing will not be tolerated. The court added: "It is a complete disregard for law enforcement's authority and for the respect this Court deserves in any courtroom that you are in anywhere."

¶ 8        The trial court also entered a written contempt order on January 3, 2025. The court

made the following findings:

"1. This Court has jurisdiction over the subject matter and the parties.

2. On or about Nov. 20, 2024, [Buck] was advised in open court of his arrest on an outstanding warrant and fled from the courtroom and bailiffs. Law enforcement personnel gave chase, and [Buck] failed to comply with law enforcement's commands to stop running, and fled the Whiteside County Courthouse. [Buck] continued to flee onto the public roadway and was eventually taken into custody by law enforcement on a valid arrest warrant.

3. The Court finds that the conduct of [Buck], which occurred in the presence of this Court, while the Court was in open session, impeded and interrupted this Court's proceedings, lessened the dignity of this court, and tended to bring the administration of justice into disrepute.

4. [Buck] was given an opportunity to make a statement in allocution, and did so."

Thus, the court found Buck to be in direct criminal contempt "by reason of his willful and contemptuous conduct." The court sentenced Buck to six months in jail, "commencing *instanter.*"

¶ 9 A docket entry from January 3, 2025, added that Buck would receive day-for-day credit against his sentence.

¶ 10 On January 28, 2025, Buck filed a *pro se* notice of appeal in case No. 23-CF-226, specifying his intent to appeal the contempt order entered on January 3, 2025. We appointed the Office of the State Appellate Defender to represent Buck. Through counsel, Buck sought leave to amend his notice of appeal to reference the correct case number. We allowed that motion.

¶ 11 II. ANALYSIS

¶ 12                              A. Mootness

¶ 13        The parties do not address whether this appeal might be moot due to Buck completing his jail sentence. Upon considering the issue ourselves, we determine that this appeal is not moot, despite Buck having likely already completed his sentence.

¶ 14        "A judgment of contempt which imposes a fine or sentence of imprisonment is appealable, enabling the reviewing court to consider the propriety of the order." *In re J.L.D.*, 178 Ill. App. 3d 1025, 1029 (1989). "However, an appeal from a contempt order is ordinarily considered moot where the party held in contempt has served the sentence." *J.L.D.*, 178 Ill. App. 3d at 1030. One exception is that even if a challenge to the sentence would be moot, a contemnor may challenge his or her conviction, as " '[n]ullification of a conviction may hold important consequences for a defendant.' " *People v. Cordray*, 2022 IL App (4th) 220413-U, ¶ 17 (quoting *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005)); see *People v. Edwards*, 2024 IL App (4th) 231329-U, ¶ 16 (addressing a contemnor's challenge to his conviction after he completed his sentence).

¶ 15        Although it seems likely that Buck has already served his sentence, the record does not reflect when or if he was released from custody. We also consider that Buck challenges the propriety of the contempt finding, the nullification of which may have important consequences for him. See *Cordray*, 2022 IL App (4th) 220413-U, ¶ 17; *Edwards*, 2024 IL App (4th) 231329-U, ¶ 16. Under these circumstances, we may consider the merits of Buck's appeal.

¶ 16                          B. Challenge to the Judgment

¶ 17        On appeal, Buck challenges the judgment on two bases: (1) the trial court punished him for conduct the court did not personally observe, without the required procedural safeguards and (2) alternatively, the contempt order is insufficient to allow appellate review. We will address

the issues in that order because Buck presents them this way and his arguments are interrelated.

¶ 18                1. *Whether the Trial Court Punished Buck for Conduct*

*the Court Did Not Personally Observe, Without the Required*

*Procedural Safeguards*

¶ 19        Buck argues that the trial court erroneously jailed him "for behavior that appears to have occurred outside of the presence of the *** court, without any of the required procedural safeguards." Buck reasons as follows. The record in a case involving direct criminal contempt must reflect that the court punished contemnor based on facts "within the court's observation and knowledge." Here, the court was "unlikely to have personally observed" some of the conduct mentioned in the written contempt order—specifically, anything "that may have followed [Buck's] egress from the courtroom" on November 20, 2024. Rather, the court "would have had to rely on third-party accounts" to make findings about what occurred after Buck left the courtroom, and the record does not show how the court acquired such knowledge. Moreover, although the court mentioned in its oral ruling that it observed Buck injure people inside the courtroom, that fact was not reiterated in the written contempt order and thus does not appear to be a basis "on which the court relied in finding [Buck] in contempt." "Because the purportedly contumacious behavior occurred outside of the presence of the court," Buck was entitled to "the full procedural safeguards of indirect contempt proceedings," including "the right to counsel, presumption of innocence, and a contested hearing at which his guilt must be proven beyond a reasonable doubt." He was not accorded such protections, so we should reverse his conviction.

¶ 20        The State responds that although the trial court provided "the full narrative" surrounding Buck's conduct on November 20, 2024, the record shows that the court held Buck in contempt for behavior occurring in the court's presence. According to the State, we must presume

that the court understood the law regarding direct criminal contempt and applied those rules properly. The State contrasts the circumstances here to some of the cases cited by Buck, in which the records affirmatively showed that trial courts lacked personal knowledge of the contumacious conduct.

¶ 21 Courts are vested with the inherent power to preserve their dignity through contempt proceedings. *People v. Sheahan*, 150 Ill. App. 3d 572, 575 (1986). To that end, courts may sanction individuals for criminal contempt "for the purpose of punishing past misconduct." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). " 'Criminal contempt of court has been generally defined as conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute.' " *People v. Hixson*, 2012 IL App (4th) 100777, ¶ 11 (quoting *People v. Javaras*, 51 Ill. 2d 296, 299 (1972)).

¶ 22 There are two categories of criminal contempt: direct and indirect. *People v. L.A.S.*, 111 Ill. 2d 539, 543 (1986). "A finding of direct criminal contempt is 'strictly restricted to acts and facts seen and known by the court, and no matter resting upon opinions, conclusions, presumptions or inferences should be considered.' " *In re Contempt of Turner*, 2016 IL App (4th) 160245, ¶ 24 (quoting *People v. Simac*, 161 Ill. 2d 297, 306 (1994)). "Direct criminal contempt may occur in either of two ways: (1) the contemptuous acts are personally observed by the judge or (2) the contemptuous acts are committed outside the immediate physical presence of the judge but within an integral part of the court, *i.e.*, the circuit clerk's office." *Hixson*, 2012 IL App (4th) 100777, ¶ 12. By contrast, indirect criminal contempt involves conduct " 'which in whole or in an essential part occurred out of the presence of the court, is not admitted, and which is therefore dependent for its proof upon evidence of some kind.' " *L.A.S.*, 111 Ill. 2d at 543 (quoting *People v. Harrison*,

403 Ill. 320, 324 (1949)).

¶ 23        Classifying contemptuous conduct accurately is important because it dictates the nature of the contemnor's due process rights. "Where a direct contempt is committed in open court it is competent for the judge to proceed upon his personal knowledge of the facts and to punish the offender summarily without entering any rule against him and without hearing any evidence." *People v. Jashunsky*, 51 Ill. 2d 220, 224 (1972). In other words, the contemnor in such instance is not entitled to "the usual procedural-due-process safeguards." *Hixson*, 2012 IL App (4th) 100777, ¶ 13. But where criminal contempt is indirect, the contemnor is entitled to far greater safeguards, including:

> " '(1) notice of the nature of the contempt charges; (2) an opportunity to answer the alleged charges; (3) right to a hearing; (4) the privilege against self-incrimination; (5) the presumption of innocence; (6) the right to be proved guilty beyond a reasonable doubt; (7) right to counsel (and to appointed counsel if indigent); (8) right to confront and cross-examine witnesses; (9) right to be personally present at trial; (10) right to testify or to remain silent; (11) right to compulsory process for obtaining witnesses; and (12) right to present the testimony of witnesses favorable to his or her defense.' " *Turner*, 2016 IL App (4th) 160245, ¶ 28 (quoting *Hixson*, 2012 IL App (4th) 100777, ¶ 19).

These same heightened safeguards are required in cases of direct criminal contempt where the contemptuous conduct occurs within an integral part of the court but outside the judge's immediate physical presence. *Turner*, 2016 IL App (4th) 160245, ¶ 28. As an example, where spectators at a jury trial handed out materials in the courtroom that contained advocacy relating to the issues in the case, but the trial court did not personally observe those contemptuous acts, the Fourth District

held that the trial court could not adjudicate the contemnors in direct criminal contempt without according them the enhanced due process protections associated with indirect criminal contempt. *Turner*, 2016 IL App (4th) 160245, ¶¶ 26, 29-30.

¶ 24 Here, the trial court held Buck in direct criminal contempt. "On appeal, the standard of review for direct criminal contempt is whether there is sufficient evidence to support the finding of contempt and whether the judge considered facts outside of the judge's personal knowledge." *Simac*, 161 Ill. 2d at 306. For the following reasons, we determine that the court properly held Buck in direct criminal contempt.

¶ 25 On January 3, 2025, the court stated on the record:

> "Mr. Buck, when you were last before this Court back on November 20th your actions caused this Court to find you in direct criminal contempt.
>
> You were advised that you had an arrest warrant by law enforcement. You fled this courtroom[,] injuring persons in the courtroom, gave chase, and fled from law enforcement officers and ignored their commands, all in the presence of this Court and so I'm finding you in direct criminal contempt."

After Buck made a statement in allocution, the court sentenced him to six months in jail. The court said that this would be a lesson to Buck that when he is told he has an arrest warrant and is going to be placed under arrest, he is "not free to leave," and fleeing will not be tolerated. The court added, "It is a complete disregard for law enforcement's authority and for the respect this Court deserves in any courtroom that you are in anywhere."

¶ 26 It is clear from this oral ruling that the trial court held Buck in direct criminal contempt based only on behaviors that the court personally witnessed and of which the court had personal knowledge. Plainly, the basis for the contempt finding was that the court saw Buck flee

the courtroom to avoid arrest, ignoring officers' commands and injuring people in the process. Although the record does not reflect who was injured, how gravely, or exactly how the injuries occurred, the facts detailed by the court adequately justify the contempt finding. See *People v. Brown*, 235 Ill. App. 3d 945, 947-48 (1992) (a defendant who fled a courtroom to avoid being remanded to jail received a 180-day jail sentence for direct criminal contempt); *People v. Ellis*, 40 Ill. App. 3d 370, 370 (1976) (a defendant who fled a courtroom and was caught on the courthouse stairs received a 6-month sentence for direct criminal contempt).

¶ 27 Reviewing the trial court's written contempt order reinforces our conclusion that the court properly held Buck in direct criminal contempt based only on facts within its personal knowledge. In paragraph two of its order, the court wrote:

> "2. On or about Nov. 20, 2024, [Buck] was advised in open court of his arrest on an outstanding warrant and fled from the courtroom and bailiffs. Law enforcement personnel gave chase, and [Buck] failed to comply with law enforcement's commands to stop running, and fled the Whiteside County Courthouse. [Buck] continued to flee onto the public roadway and was eventually taken into custody by law enforcement on a valid arrest warrant."

Focusing on this paragraph of the order, Buck suggests it is unlikely that the court personally saw him enter the public roadway or personally saw the subsequent arrest. However, the next part of the order makes it clear that the court held Buck in direct criminal contempt only for behavior that the court personally witnessed. Specifically, paragraph three said:

> "3. *The Court finds that the conduct of [Buck], which occurred in the presence of this Court, while the Court was in open session*, impeded and interrupted this Court's proceedings, lessened the dignity of this court, and tended

to bring the administration of justice into disrepute." (Emphasis added.)

In other words, the court expressly confirmed in the order that the basis for the contempt finding was limited to behavior that the court personally witnessed. Additionally, the court's oral findings inform our interpretation of the written order, so we reject Buck's contention that a few statements in the written order fundamentally changed the nature of the contempt proceedings from direct to indirect.

¶ 28    Buck insists that the contempt here was indirect rather than direct because it is possible or likely that the trial court did not personally witness the events that occurred after Buck left the courtroom. The premise of this argument contradicts the well-settled notion that courts are presumed to know the law and apply it properly, absent affirmative indications in the record to the contrary. *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 136. Accordingly, we cannot reverse the judgment on the mere suspicion that the court might not have observed something personally. Moreover, events occurring after Buck left the courtroom were not essential to the finding of contempt, as the court personally witnessed Buck flee the courtroom to avoid arrest and saw the resulting injuries. See *L.A.S.*, 111 Ill. 2d at 543 ("Indirect criminal contempt is contemptuous conduct 'which in whole or in an essential part occurred out of the presence of the court, is not admitted, and which is therefore dependent for its proof upon evidence of some kind.' ") (quoting *Harrison*, 403 Ill. at 324).

¶ 29    Even were we to assume that the trial court was not present when Buck was arrested and did not personally observe Buck entering the roadway, that would not change the result of this appeal. Case law supports the notion that superfluous references to facts outside a court's personal knowledge will not undermine an otherwise valid direct-criminal-contempt order that was appropriately based on the court's personal observations. In *Cordray*, 2022 IL App (4th) 220413-

U, ¶ 8, a trial judge perceived that the defendant was inebriated at his sentencing hearing, so she continued the hearing and ordered the defendant to take a drug test. When the matter next returned to court, a probation officer informed the court that the defendant tested positive for cocaine, methamphetamine, and alcohol two days after the last court date. *Cordray*, 2022 IL App (4th) 220413-U, ¶ 9. In addition to sentencing the defendant for the underlying offense, the court sentenced him to 180 days in jail for direct criminal contempt. *Cordray*, 2022 IL App (4th) 220413-U, ¶ 10. As part of explaining the basis for contempt in its oral ruling, the court said: " 'You brought the administration of justice in this courtroom into disrepute and are guilty *** of direct criminal contempt for showing up for your sentencing hearing in a condition under the influence of methamphetamine, cocaine, that was in your system 48 hours after you were in court.' " *Cordray*, 2022 IL App (4th) 220413-U, ¶ 10. On appeal, the defendant challenged the contempt order on the basis that "his allegedly contemptuous behavior did not sufficiently take place within the trial court's presence because the court 'did not personally observe the taking of illegal drugs.' " *Cordray*, 2022 IL App (4th) 220413-U, ¶ 14. We rejected this argument and affirmed the judgment, reasoning in part that "the [trial] court's brief reference with respect to the specific substances defendant tested positive for was nothing more than unnecessary surplusage because the court observed defendant's behavior firsthand at the [original sentencing] hearing and needed no extrinsic evidence to find defendant in direct criminal contempt." *Cordray*, 2022 IL App (4th) 220413-U, ¶ 21.

¶ 30    *Cordray* illustrates that extraneous references to facts beyond a court's personal knowledge do not inherently nullify an otherwise valid direct-criminal-contempt order. Here, the argument in support of an affirmance is even more compelling than in *Cordray*. In *Cordray*, the appellate court affirmed even though the record showed that the trial court (1) received some

information from a third party (the probation officer's representations about the results of the drug test) and (2) expressly mentioned that information when identifying the contemptuous conduct. *Cordray*, 2022 IL App (4th) 220413-U, ¶¶ 9-10. Here, there is no affirmative proof in the record that the court received information from a third party, and the language in both the court's oral ruling and its written contempt order confirms that it relied only on its personal observations.

¶ 31　　　　Buck cites cases where the records on appeal affirmatively showed that the trial courts lacked personal knowledge of all facts necessary to make findings of direct criminal contempt. See, *e.g.*, *People v. Tomashevsky*, 48 Ill. 2d 559, 565 (1971) (explaining that principles of direct criminal contempt did not apply where a judge heard laughter in a crowded courtroom but did not personally know whether the two contemnors laughed). *Tomashevsky* and other similar cases are distinguishable, as the court's oral ruling and written order here make it clear that the court personally witnessed Buck engaging in behavior that was undeniably contemptuous—fleeing the courtroom to avoid arrest.

¶ 32　　　　Buck also submits that the trial court did not rely on the injuries to people in the courtroom as part of the basis for holding him in contempt, given that the written order made no mention of injuries. This argument is unavailing. Even if there were a conflict between the oral and written rulings in that regard, the oral ruling would prevail. See *People v. Watkins-Romaine*, 2025 IL 130618, ¶ 38 (noting that in the event of a conflict, a court's oral statement controls over the written judgment).

¶ 33　　　　Accordingly, we hold that the trial court properly held Buck in direct criminal contempt without affording him the much broader procedural protections attendant to cases involving indirect criminal contempt.

¶ 34　　　　　2. *Whether the Contempt Order Is Conducive to Appellate Review*

¶ 35    Alternatively, Buck argues that the trial court denied him due process of law by jailing him for direct criminal contempt "without laying out the necessary facts giving rise to that finding in either a written order or in a verbatim transcript." Thus, he maintains that the appellate court "cannot determine the propriety of summary direct contempt proceedings in general or the sentence imposed in particular." The premises of Buck's claim are very similar to what he argued in support of the preceding issue. Specifically, he proposes that (1) we cannot ascertain for which behaviors the court held him in contempt and sentenced him, (2) the basis for contempt may have been facts that the court did not personally observe, and (3) the court did not sufficiently detail how it was personally aware of all the facts mentioned in the contempt order. Buck also contends that the record is not conducive to determining whether his sentence was justifiable by appropriate sentencing factors or whether he proximately caused an injury to anybody in the course of fleeing the courtroom.

¶ 36    Responding to these arguments, the State reiterates its position that the trial court properly held Buck in direct criminal contempt based on conduct the court witnessed. The State also notes that in imposing a sentence, a court is not required to outline all the factors it considered. In the State's view, the court properly took into account that Buck's conduct injured people in the courtroom, as (1) the court observed this event and (2) Buck expressed his apologies to whomever he injured. "[I]nsofar as [Buck] raises a sentencing argument," the State further maintains that the six-month jail sentence was not an abuse of discretion.

¶ 37    As this court explained in *Betts*, 200 Ill. App. 3d at 49:

> "In direct criminal contempt proceedings in which a judge has personal
> knowledge of all of the facts establishing contemptuous conduct, no formal charge
> is filed and no plea, issue or trial is required. Moreover, [the presentation of]

- 13 -

evidence is unnecessary ***. [Citation.] Because the respondent is entitled to appeal a direct contempt conviction, the record made in the trial court must, however, be sufficient to permit a reviewing court to determine whether the trial court had jurisdiction to enter the contempt order. Thus, the facts supporting the finding of contempt must be fully set forth in the contempt order [citation] or must appear in the transcript of the proceedings at which the contempt finding was made." (Internal quotation marks omitted.)

In evaluating whether a contempt order is conducive to appellate review, we may consider both the written order and any oral findings. See *People v. Wilson*, 35 Ill. App. 3d 86, 88 (1975) ("[W]here there is a complete report of proceedings which includes an oral statement of the facts by the court, *** the report of proceedings as well as the order of the trial court will be considered on review to determine the propriety of the order of contempt.").

¶ 38        Here, the trial court made oral findings and entered a written contempt order. For the same reasons explained in the preceding section, we reject Buck's alternative argument that the contempt ruling is not conducive to appellate review. To reiterate, the record reflects that the court held Buck in direct criminal contempt for conduct that the court personally observed, and there is no basis to speculate that the court improperly punished Buck for conduct that the court learned about from third parties. The behavior that the court witnessed was contemptuous and deserving of a six-month jail sentence. We discern no impediment to our review.

¶ 39        Buck relies heavily on *Le Mirage* to argue that the trial court here should have provided more details about the injuries in the courtroom to allow for an evaluation of (1) whether Buck's conduct proximately caused the injuries and (2) whether the court considered an improper sentencing factor. To that end, Buck asserts that it is unknown whether he injured people in the

courtroom by pushing them out of the way or whether a police officer caused the injuries by firing a gun or pepper spray into the crowd.

¶ 40    *Le Mirage* is an indirect criminal contempt case that did not present any issue as to whether the challenged order was conducive to appellate review. In that case, a court ordered the owners of a nightclub to vacate the second floor of a building due to code violations. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 1. The owners continued to operate the nightclub on the second floor despite the order. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 1. One night, a fight broke out in the nightclub, and security guards responded by using pepper spray. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 1. This caused patrons to panic, and 21 people were crushed to death. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 1. The City of Chicago then filed a petition to adjudicate the owners of the nightclub in indirect criminal contempt for violating the order to vacate the second floor of the building. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 11. At the jury trial on those charges, the court barred evidence of the tragedy because such evidence was unduly prejudicial. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 39. The jury found the owners guilty of indirect criminal contempt. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 38. The court allowed the City of Chicago to argue at sentencing that the tragedy was an aggravating factor, and the court sentenced the owners to two years in prison. *Le Mirage*, 2013 IL App (1st) 093547, ¶¶ 39, 43. One of the issues on appeal was whether the court improperly considered the tragedy as an aggravating sentencing factor. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 116. The appellate court determined that the owners' conduct was not a proximate cause of the tragedy, as the deaths were unrelated to the structural flaws that had prompted the order to vacate the second floor of the building. *Le Mirage*, 2013 IL App (1st) 093547, ¶¶ 120-21. Thus, evidence of the tragedy was "not relevant to establishing the seriousness" of the owners' conduct or evaluating their rehabilitative potential. *Le Mirage*, 2013

IL App (1st) 093547, ¶ 135. The matter needed to be remanded for resentencing because the appellate court could not ascertain how much weight the trial court placed on that improper factor. *Le Mirage*, 2013 IL App (1st) 093547, ¶ 142.

¶ 41 Buck's reliance on *Le Mirage* in suggesting that there may be a genuine doubt as to proximate causation here is unpersuasive. The trial court said that Buck "fled this courtroom[,] injuring persons in the courtroom." In his statement in allocution, Buck apologized "to the Court and to whoever I injured in that moment." Based on the record, the notion that the referenced injuries might have been proximately caused by some intervening event that was completely unforeseeable to Buck when he chose to flee the courtroom seems fanciful.

¶ 42 Buck maintains that the trial court should have included additional details as to how the injuries occurred and made additional findings shedding light on why it decided to impose a six-month jail sentence. However, the specific question for our consideration is whether the court's oral findings and written contempt order are bereft of substance and preclude meaningful appellate review. Under the circumstances, the judgment is indeed conducive to appellate review.

¶ 43                                    III. CONCLUSION

¶ 44          For the reasons stated, we affirm the trial court's judgment.

¶ 45          Affirmed.